Your honors, good morning. I'm Dave Parmenter. I represent Mr. Beasley, the appellant. I'd like to reserve about five minutes if I could. Sure. I was trial attorney along with Mr. Paskett, who's here arguing on behalf of the government in this case. I have raised four different issues of error. What's your strongest issue? I would say the Brady matter. It involved a video that was reported early on in the reports. So let me ask you about that. Is there any evidence in the record that the government had the video? You're talking about the video of the fight? I am. Yeah. Is there any evidence that the government had that? What they had was a detective, and I believe it was a Fort Hall agency. This was before Beasley had come to light. It was in the first year and a half when they were looking for the victim, found out what happened to him. It was observed by a detective. I believe it was from Fort Hall. It was referred to two or three times in the written reports we had. And then when this case came to light, it was mentioned. In fact, it was mentioned in trial testimony by the victim's mother. She had seen the video. It was one that was recorded. You've given me evidence to suggest that the video existed, but any evidence that the government had the video? The U.S. Attorney's Office, I'm not sure they actually had it in their possession. How was Brady triggered if the government didn't have the video? Excuse me? How is the Brady rule triggered if the government never had the video? Well, they had access to the detectives that were investigating the case, not only the FBI agents, but also the detectives at Fort Hall. So is your argument that the government had an affirmative duty to acquire the video, or do you think that the government had a duty to disclose something other than the video? I believe that they had an affirmative duty to try and locate it. They apparently tried to do that. Did they even know about it? I mean, is there any suggestion that they knew a video existed and just ignored that? There was a lot of evidence, a lot of different investigations going on. It's my understanding that they had access to the video or could obtain it through the detectives and through the investigators that they had. Counsel, I have a concern as well as to whether there is a Brady violation here. In addition to the issue about whether the government ever had it, isn't it true that referenced in the discovery material, the investigation reports, was that this video had been reviewed, and didn't the jury hear from the victim's mother in the courtroom what the video depicted, that it showed the victim in a fight on a different occasion? So what additional exculpatory or helpful evidence to the defense would the video have shown,  Well, it was briefly before the jury as far as that went, but I believe the video, had we had the video, would have helped show that the victim was a person that had engaged in previous violent conduct. But the jury knew that, didn't it? Not really. Not really when the mother testified that it was depicting a fight by her son on a different occasion? I don't think that we really portrayed it that way. She was just asked briefly about the video, if she'd seen such a video, and she had that. I mean, part of the problem here, it seems to me, is that the trial judge would have had to balance the probative value of sort of opening up a second trial on whether or not such a fight had occurred, and whether or not the victim was the primary aggressor or the victim. And it seems to me there's case law that says this within the discretion of the trial court, as to how far the defense will be permitted to go. It would have brought in 404 character evidence, and it would have been an entirely different aspect, but that was something that we were willing to do if we could have located the victim. No, I understand why you wanted it, but what I'm suggesting is you might not have been allowed by the trial court to get in as much as you wanted, aside from the video itself. That's possible. And Brady, as I understand it, requires that the knowing or accidental, reckless withholding of exculpatory evidence has to make a difference, in that the outcome would have been different if the jury had been shown this evidence that was wrongfully withheld. That's correct. I think the court has to evaluate the potential Brady information that wasn't disclosed or wasn't provided. So if we conclude that based on what the jury actually heard, you got about as much as you were going to get anyway, then would there be a Brady violation at all? Well, we believe there potentially would have, with the anticipation that we would have presented other evidence of his violent character and brought in 404 evidence. I thought you tried to do that. Excuse me? I thought you tried to do that. Didn't Judge and I say, no, we're not going to withhold? No, we walked kind of a fine line because we didn't have the video and because they had a couple of witnesses that they were contending that Mr. Beasley was potentially violent, then we made a decision not to go down that road, a tactical decision. That's exactly correct. Can I ask you a question about the prior consistent statement issue? Yes. So as you know, the rule is you can get a prior consistent statement in if it happens before there is a motive to lie. I am struggling with your theory about why the statements that you think shouldn't have come in were made after a motive to lie arose. The argument that we made or that I've tried to make is that the statement has to be made prior to the time that the motive to falsify arose. But the motive to falsify arose after the fact. So you're acknowledging that that part of the rule is not satisfied in this? No. What I'm saying is that the motive to falsify arose the day of the stabbing for a couple of reasons. Number one, she was a potential accomplice in hiding the body. And we're talking about Althina Pocatia. And because she testified that she was subject to a probation violation. That would make sense if the prior consistent statement that came in was to a law enforcement officer. But that prior consistent statement was to somebody else who was also present that day, also apparently helped dispose of the body. So why would she have had a motive to lie to him? He knew everything. The statement didn't come in until four or five days according to him after that. The stabbing took place on February 3rd. The Super Bowl party took place on February 4th. He was at the Super Bowl party, but he was intoxicated. According to his testimony, he was not even aware of what happened in the Super Bowl until 30 or 40 seconds before the game ended. And then he left the home, didn't come back to that home for a couple of days. And it was two or three days after that that she purportedly made this statement to him. But doesn't that go to the weight that the jury would accord the witness' testimony or recollection of what Ms. Pocatilla told him? That's not a question of admissibility. It's a question of weight to be given. Was this a credible rendition of what she said? I believe it is an issue of admissibility. It was a very important point in the case for us. The difficulty we had in this trial is that, as you may have determined from our briefs and maybe from counsel's brief, her testimony completely added this story about the Super Bowl, the day of trial. We were scheduled to start on Monday. It was Friday that I got a call, and then Monday they confirmed that she would be testifying, that it was she that had caused these injuries to the defendant. Remember that we had a doctor's report. He'd gone into the hospital emergency room three days after the stabbing. And so our theory all along was it was the victim that caused that injury, those injuries to him. And we had multiple reports from Ms. Pocatilla, from Mr. Brewster, and other, well, they were the two main witnesses that were there besides Mr. Beasley, that he had been struck and been struck, according to Ms. Pocatilla, several times. So when you got the call on Friday, as far as you could tell, this was the first time that the government knew about this particular piece of evidence? I believe so. And I was just speaking about that with Mr. Paskett before our arguments, and he had indicated that it was in trial prep that this information came out. So it was a big surprise to us. It kind of threw us off our game a little bit as we were preparing for trial. We did call the doctor, had him testify about the injuries. According to our theory, it was consistent with what had happened at trial, or excuse me, what had happened as we prepared for trial. I mean, I understand that that would have changed the nature of the trial significantly at the last minute. But what I'm not hearing is an explanation for why it is that she, a few days after both the stabbing and the apparent altercation at the Super Bowl party, why she would have had a motive to lie to one of her buddies, seemingly one of her buddies because he's at all these key events, about what happened between her and the defendant. Our theory is she didn't like Mr. Beasley very much, even though in her testimony and in cross-examination, she acknowledged that their relationship continued for several months after that. He was in custody in June 2019. This was a year and a half after the stabbing because they had a little row that was investigated, and that was when they actually split up. So she acknowledged despite this adulterous relationship with this other gal during the Super Bowl, a day after the stabbing, they continued their relationship. That didn't make any sense to me. And it didn't make sense that they would continue that relationship for a year and a half when he testified that that was the one and only fight they had. That was what broke them up, this dispute when she beat him up, when she found out about his infidelity. But that was a year and a half after the fact. Coincidentally, that was the same charge that resulted in him being arrested. He was arrested for resisting. The resisting came in for not opening the door when Fort Hall police came to investigate what was going on. He had been beat up by her, and yet he ended up going into custody because he was unable to make bond. He spent over 30 days in jail, and that ended up resulting in the disturbing. It was pled to disturbing the peace, and that ended up in his having a criminal history Category 2, which kind of gets into the sentencing issue and the sentencing argument. And I acknowledge that he spent more than the 30 days required, but it just, I guess, kind of grinds on me a little bit that that was, in fact, what put him in a criminal history Category 2 when she was the one that really had abused him. Counsel, you'd asked to reserve five. Do you want to reserve? Yeah, okay. I will. Thank you. Thank you. May it please the Court, my name is Justin Paskett, and I am representing the United States in this matter. I'll begin by addressing in order some of the issues raised by the Court. It is the government's position in this case that there was no Brady violation. Understand that's a… Was this raised before the district court, the Brady violation? It was not. There was no motion made by defense counsel to compel. There was no motion to dismiss based on a Brady violation. This was not litigated before the district court. I mean, has it been waived, or are we limited in our review? It's the government's position that the standard of review, when it hasn't been raised at the district court, pursuant to United States v. Guzman-Padilla, is plain error. So the Court can still look at it for plain error, whether or not it was a Brady violation. But in the government's evaluation of this, the facts that we have before us is there was a police report that came out of the missing persons case of the victim, Austin Pivo. During the course of that missing persons case, law enforcement was doing what they should be doing, which is trying to figure out what happened to Austin Pivo. They didn't know. They interviewed a large number of people. During the course of those interviews, at one point, a Fort Hall police officer was shown a video of Austin Pivo, the victim in this matter, engaged in a fight with another individual on a different date. That was noted in a police report. Did he take a copy of that video? It's unclear whether or not a copy was retained. This was a Fort Hall detective? This was a Fort Hall detective before the investigation turned to a clear homicide investigation. As Austin Pivo in this case, his body was not discovered for nearly two years, or approximately that amount of time. For the initial investigation, before Althina Pocatilla came forward to law enforcement, it was simply a missing persons case. That was noted. Did the video ever get into the hands of the federal? It was not in the hands of the U.S. Attorney's Office. I can tell the court, and this is not part of the record, but I can tell the court that... The Fort Hall investigators, they are federal investigators? They're involved in federal investigations. This is going to be an FBI case, wouldn't it? It became an FBI case once it became a homicide case. But the Fort Hall investigators were not, that wasn't FBI? It was not, although in candor to the court, the... They wore dual hats. They can. There are cases that are investigated on reservations, Fort Hall police, all felonies. But the feds wouldn't have jurisdiction over a domestic violence or missing persons case until it... Not until it became a felony crime, and in this case a homicide. I can tell the court, again, it's not part of the record. It was requested. FBI did look repeatedly to try and find this video to turn it over. It was never in... So you're saying the FBI actually did look to try and find the video? There was an attempt to locate the video. And because you'd seen it in the report? And... Were you concerned about a brevity violation? Is that... No. Or you just wanted to know for your own investigation? Mr. Parmenter had asked about it. We looked for it. There was no sign of anywhere in FBI's custody or going back to Fort Hall and looking. Even if we were going to impose, it's not clear that we should, but even if we were going to impose an affirmative obligation, you're saying you complied with that. There were attempts made to recover this video. The video was never found during those attempts. What was disclosed was everything that was known about the video, and that was disclosed in the report. How do you think we should resolve the Brady argument? I mean, it sounds like you're not... I mean, you're agreeing that we should review it, but only for plain error. Would you think that... I mean, that we should say, well, the government never had custody of the video, therefore it couldn't be a Brady violation? Your Honor, I... Or do you think that there's another way? I think the way to look at this and looking at the government's sites, United States v. Rodriguez, which is a Ninth Circuit case, that effectively says when we're looking at the allegation of a Brady violation, if the substance of what would be contained in that piece of evidence was disclosed adequately, then there's no potential Brady violation. In this case, there was a description of the video. I see. So you're just saying we don't need to get into who had possession or when not, that just there's no substantive Brady violation? I think in this case that would be accurate, Your Honor. The substance of what was in that video was disclosed to defense. Defense actually used, in going a little bit further and doing a relevance evaluation of whether or not they could even use it, the defense used the substance of that to cross-examine the victim's mother in this case and ask about that video, ask about that other fight, and then there comes the question of... So I would think that you would want us to rule that, look, we didn't have it, so therefore it can't be a Brady violation because that would, I mean, it seems like that would cut off more in the future. But you think that there's some concern about that? Well, I don't know that there's concern, Your Honor, but in full candor, the Fort Hall Police Department may have taken custody. It's unclear, and the difficulty in this case is the record is not clear on it. It was not raised before the court, so we don't have a record. But Fort Hall may have had access to it, and they didn't have it. What I'm saying is there's no Brady. We don't decide cases on what may or may not have happened. We decide cases on what our record shows, and our record shows here that the government had no possession of that video. Am I wrong about that? Your Honor, what is in the record is the United States Attorney's Office never had this video, and we didn't have access to it. We disclosed what knowledge we had. Why isn't that enough? I mean, I'm just interested in why you're waffling on this because I would think that you would want to take the position that, look, we never had access to it. We never had a responsibility to turn it over. That's a bright-line rule that we know going forward. Your Honor, I think that's a fair consideration. I guess the difficulty that I'm having in trying to be fully candid with the court and maintain my view is that it's unclear in the record whether or not Fort Hall police ever had it. If Fort Hall police never took custody of it. I guess that's my question because now you're making me think there could be a Brady violation even when the U.S. Attorney's Office doesn't have it, and I hadn't understood that to be true. I mean, and that seems to be clear. You just seem to be saying even if Fort Hall had access to it. Your Honor, I believe that there is an obligation to disclose things that are in the, not just the prosecutor's possession, but an agency that works, a law enforcement agency that's an arm of the prosecution. In this case, it was a joint investigation. In this case, Fort Hall police are law enforcement, and even though they're not FBI, any felony that occurs on a reservation is under the jurisdiction of the United States Attorney's Office. So what in the record makes this an open possibility that the video existed in the hands of some law enforcement as opposed to it didn't? Your Honor, that's the tricky thing. There's nothing in the trial record. There's nothing that's been filed. You're just being cautious. That's why I keep coming back to we decide cases based on the record. I agree. What is there that says that this is a possible issue? In the record, there's nothing there. What has been informally said to this court by defense counsel and what I'm telling the court now is there were efforts made by the government to try and get this video at the request of defense counsel. Do you think you had a duty to do that? I mean, I guess you're saying you did. If a federal arm had this, you did have a duty to go and retrieve it. Your Honor, as a prosecutor, I am always trying to operate in the light of day, which means if we have something in our possession, we have a duty to disclose it. That's clear. The question is do you have a duty to go out and get something that's not in your possession. You're saying the concern here was if Fort Hall did have it and they were considered to be a federal branch, that you would have then had a duty to disclose it and therefore you had a duty to go and investigate. We would have. If they had it and we could recover, we would have handed it over. You're saying you did have a duty to go actually and make this affirmative request. There may be arguments that the missing persons case was separate aside from the investigation of Justin Beasley. Certainly in this case, the government would have had relevance in 403 balancing arguments against entering the video. But there's also some strategic considerations, as Mr. Parmenter has brought up, that if, in fact, he raises character evidence dealing with character propensity for violence of the victim, then that gives the government the opportunity to bring in character evidence or evidence that the defendant had a character trait for violence. And the government had evidence of that and was ready to respond. That is in the record and was discussed that should the defense go down that path of trying to say the victim in this case had a character trait for violence, the government was willing and able to respond to that by saying, actually, there's not that much evidence of that, but there is, in fact, strong evidence that the defendant in this case. Which presumably informed the defense's tactical decision not to push this any further. I would certainly agree. The record reflects that, and that was consistent with even what defense counsel argued now. But isn't the short answer to Judge Nelson's question, look, we tried to find it, the FBI went out and looked for it, and they couldn't recover it? Yes, yes. What I can't say definitively is whether or not it's clear from the report if that officer ever, in fact, took possession of it and somehow misplaced it. The key evidence that I remember from the record on possession of this video was the mother's statement of she saw it, and it got deleted before she turned it over to law enforcement. I don't know that through the course of the investigation, that was the only place that this officer had that recovered the video or didn't recover the video. But I agree. Didn't she testify that she accidentally erased it from her phone? She did, but I don't know that the officer in this case that put it in his report got it from the mother. And so it's a little bit more complicated than that. We don't even know if the officer ever actually had possession, other than just saw it. It's unclear if they took possession and it was deleted, or if they took possession and it was lost. What I can tell the court definitively is once that was requested, there were efforts made by FBI to go find it. But your point is you made an effort, even if there was some problem here, there's just not an underlying Brady violation because this evidence was disclosed or the substance of the evidence was disclosed. The substance of the evidence was disclosed, and the ability to utilize that evidence as the defense would like was available to the defense. Can I ask about sentencing? Did Beasley concede that his prior conviction placed him in criminal history category 2? That is the government's position on this, that at the time of sentencing, the primary argument was, well, this was reduced to a disturbing the peace. And from the government's position, this is a very straightforward issue because whether it's disturbing the peace or whether it was resisting and obstructing officers, if he spent more than 30 days in jail, it qualified him. And in this case, he spent closer to 90 days in jail and was given a sentence at the time of the resolution of that state case. I have two points. I keep beating the same drum. I don't see anywhere in the record that he actually pled to disturbing the peace. He was charged with resisting obstructing. Is there something in the record that says that his conviction was actually for a different offense? Only argument of counsel that's in the transcript. Okay. And then the other thing is, why does that even matter? Because both disturbing the peace and resisting obstructing are listed in the sentencing guidelines. It's the government's position it does not matter. That if he was given that sentence of at least 30 days of jail, whether it's disturbing the peace or resisting and obstructing is immaterial. The government agrees with Your Honor on that. The question is whether or not the jail time was there. And in this case, he was given a sentence of time served, and he served approximately three times that amount of time. The sentence was below guidelines, right? The sentence was a guideline sentence at the high end of the guideline range. Oh, okay. So it was a high-end sentence. I will note that the court did, and it is contained in the record of the trial transcript, or the sentencing transcript, the court did do an evaluation of the 3553A factors. There was some discussion of mitigation, but ultimately, and I think what's maybe a little bit lost in the briefing even, is the court made a note of the aggravating factors. And in this case, coming to a high-end guideline conclusion, the court found as a major aggravating factor, this was a violent offense, but even more than that, the defendant was murdered and his body was hidden for close to two years, not quite two years. The mother of the victim in this case had to wait around, having no idea where her son was. And that was an extreme aggravating factor. The court noted that at the time of sentencing, but pursuant to the evaluation. It was still within guidelines. It was still within guidelines. It was a high-end guideline sentence, and it was within the guidelines with the consideration of aggravating and mitigating factors. And the trial court went into both of those factors of aggravation and mitigation and ultimately found, as the government argued, that a high-end guideline sentence was justified in this case. So is the record basically based on the pre-sentence report at paragraph 73 on page 20 that recounts his arrest for resisting or obstructing officers, and it notes that he pled guilty and was sentenced to 180 days in jail with 92 suspended? That was what informed the sentencing court as to whether or not that should qualify under the U.S. Sentencing Guidelines. That's correct, Your Honor. If there are no further questions, I would ask that the court affirm the conviction and sentence. Thank you, and we do appreciate your candor. We expect that from the government, and you fully complied with that, and we appreciate that. Thank you, Your Honor. Actually, we expect that from all candidates. Yeah, fair enough, fair enough. We expect more from the government. Fair enough. Well, I try and be candid, too. No, that was not a slight on you by any stretch. Just a couple of comments. The erasal of her video didn't mean that the video wasn't available by someone. She mentioned in her testimony the individual that she had received it from. It may have been the same individual that had been reviewed by Fort Hall. Let me just turn to sentencing briefly. Can you point us to one of the factors that you think the district court judge did not consider? The 3553A. I believe that he did a cursory. This is what he said. He referred to Mr. Beasley as being bipolar, difficult childhood. I think he had an ACES score of 7. Talked about his alcoholism, abusive father, went through some of those factors. But I guess, and I understand it was a guideline case, but he was at the very high end of the guideline, and that's kind of why the criminal history Category 2 is so important and I think something that the court should have at least considered. And I take it you don't agree that he conceded, or that you conceded, that the prior conviction placed him in a criminal history Category 2. We filed an objection to the PSR, but the PSR basically said, regardless, he spent more than 30 days in jail, and so that was what the court had to work with. So, yes, I'd filed an objection, but I acknowledge that the guidelines state that, and so I was, I guess, kind of arguing into the wind, so to speak. We get a lot of opportunity in Idaho, southeastern Idaho particularly, to argue into the wind. We do. It's fairly windy. Anyway, yeah, I just felt that over 28 years, 327 months was a little excessive given the circumstances, and I certainly understand, and Mr. Beasley apologized to the family for the stabbing, for his involvement in that, and so with that, I believe that's all I have. Thank you. Okay. Thank you. We appreciate both counsel's arguments in this difficult case, and the case is now submitted.
judges: TALLMAN, NELSON, FORREST